NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0110n.06

Case No. 23-1349

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Mar 11, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| TANGER GRAND RAPIDS, LLC, | ) | |
| | ) | |
| Plaintiff - Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| | ) | |
| ROCKFORD CONSTRUCTION COMPANY, | ) | |
| | ) | OPINION |
| Defendant - Third Party Plaintiff - Appellee, | ) | |
| | ) | |
| | ) | |
| TANGER DEVCO, LLC, | ) | |
| | ) | |
| Third Party Defendant - Appellant. | ) | |
| | ) | |

Before: GIBBONS, WHITE, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Minor mistakes can have major consequences, and this case proves the point. When Tanger Grand Rapids needed a parking lot, it contracted with Rockford Construction Company to build it. But the materials Tanger directed Rockford to use ruined both the parking lot and the project team's relationship. Tanger now seeks to hold Rockford responsible for the parking lot's failure. Rockford, however, held up its end of the bargain. Because the district court concluded the same, we affirm.

I.

Tanger Grand Rapids, LLC ("Tanger") is a North Carolina property developer.[1] In 2014, it set out to build a mall in Byron Township, Michigan. Tanger hired several Michigan contractors for the job. Nederveld, Inc. ("Nederveld") was the civil engineer, Materials Testing Consultants, Inc. ("MTC") provided geotechnical services, and Rockford Construction Company ("Rockford") was the general contractor. Put simply, Nederveld designed, MTC tested, and Rockford built.

The remaining facts arise from construction of the mall's parking lot. Before work began, MTC submitted a report recommending the materials Tanger should use. For the base layer—the layer of soil sitting directly below the asphalt surface—MTC recommended either "MDOT 22A" or "MDOT 21AA" soil. R. 464-1, Pg. ID 3551; R. 465-1, Pg. ID 3590. For the subbase layer— which sits below the base layer and just above bedrock—MTC called for "MDOT Class II" soil or an "approved equivalent." R. 464-1, Pg. ID 3551. The report clarified that subbase soil "visually classified as SP-SM or SP" would suffice. *Id.*, Pg. ID 3542. ("SP-SM" is an abbreviation for "poorly graded sand with silt," and "SP" is an abbreviation for "poorly graded sand." *Id.*) On MTC's recommendation, Tanger—in consultation with Nederveld—settled on 21AA for the base layer and MDOT Class II for the subbase. They specified those choices on the job's drawing.

Meanwhile, Rockford prepared for construction. Rockford's contract with Tanger set the ground rules for the job.[2] The contract included a set of Contract Documents, labeled Exhibits A

---

[1] Tanger Devco, LLC is the other appellant in this case. It is an LLC designated as the "manager" of Tanger Grand Rapids, LLC. R. 496-2, Pg. ID 5762; R. 496-3, Pg. ID 5788. For purposes of this appeal, the appellants' legal interests are the same. So we refer to them collectively as "Tanger."

[2] In the district court, Rockford argued that Tanger Grand Rapids didn't have standing to sue Rockford because Rockford's contract was with Tanger Devco. Although Rockford doesn't renew this jurisdictional argument on appeal, we have an independent obligation to address it. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

The Tanger-Rockford contract lists Tanger Grand Rapids as the signatory. But the actual signor was Thomas McDonough, who signed as "Tanger Devco, LLC, its manager." R. 457-1, Pg. ID 3279. "Its" apparently refers to Tanger Grand Rapids; Tanger Grand Rapids's Operating Agreement lists Tanger Devco as its "[m]anager." R. 496-

through K. Exhibit D, entitled "Clarifications," stated that the "[p]roject site" was "based on utilizing all on site materials for cut/fill and subbase materials." R. 459-1, Pg. ID 3347. The site's previous building—a year-round recreational facility called "Dome World"—had recently been demolished, leaving behind a stockpile of base and subbase materials. Tanger wanted to use that stockpile—rather than ship in new materials—to save money on the project.

MTC visually inspected the on-site subbase material and classified most of it as SP/SP-SM. It also tested the on-site base material and found it met 22A, but not 21AA, specifications. The on-site material thus looked appropriate for use; recall that MTC's report concluded SP/SP-SM and 22A were acceptable for the subbase and base, respectively. As far as Tanger knew, its money-saving gambit had worked.

Rockford, on the other hand, had a dilemma. The construction drawing provided by Tanger and Nederveld required 21AA for the base layer. But MTC's testing showed the on-site materials met only 22A specifications. So Rockford sought clarification from Nederveld. It asked whether it could "use the 22A gravel in lieu of the required 21AA." R. 463-2, Pg. ID 3509. Nederveld's lead engineer, R. Jack Barr, confirmed 22A was an "acceptable substitute" for 21AA. *Id.* Assurance in hand, Rockford got to work, using only the on-site subbase and base materials.

Rockford completed the parking lot in July 2015. But only four months later, deformities had snaked their way through the pavement. Disappointed, Tanger instructed Rockford to correct any work inconsistent with the contract's requirements. Rockford proposed to "perform correct work" and "committed to help[] correct the work . . . as required by the terms of the Contract."

---

2, Pg. ID 5762. Tanger Grand Rapids and Tanger Devco are separate legal entities. But under Michigan law, managers are agents, and an agent has the authority to enter contracts on behalf of its principal. *See* Mich. Comp. Laws § 450.4406. By signing the contract as Tanger Devco, McDonough bound the principal, Tanger Grand Rapids. Tanger Grand Rapids is thus a proper party to the contract and has standing to bring its claims.

R. 492-15, Pg. ID 5630. As a result, it coordinated some superficial repairs, but the cracking only worsened. Meanwhile, Tanger hired several engineering firms to figure out what went wrong.

Soon enough, Tanger had its answer: the on-site materials weren't what Tanger thought they were. Relying on Nederveld and MTC's certifications, Tanger thought it was using 22A for the base and SP/SP-SM material for the subbase. But in reality, most of the on-site materials didn't meet those specifications.

That mistake proved disastrous. The specific problem was the on-site material's excessive amount of fine particles—called "fines." When rain or snow falls on pavement, soils with high fines concentrations don't drain as efficiently as soils with lower concentrations. Moisture draining from the surface thus remains trapped in the high-fines soil just beneath it. In a frigid Michigan winter, that sub-surface moisture freezes into a thin layer of ice. Intermolecular forces then draw water up from the warmer, lower layers of soil toward the ice layer. *See* Rorik A. Peterson & William B. Krantz, *A Mechanism for Differential Frost Heave and Its Implications for Patterned-Ground Formation*, 49 J. Glaciology 69, 70–71 (2003). In turn, that water freezes, and the ice layer expands. *Id.* Eventually, it grows large enough to displace the soil above it. *See Frost Heave*, Encyclopedia of Geology 867 (2d ed. 2021). Often, that soil has nowhere to go but up, splitting the surface layer in the process. *See id.* The result, in Tanger's case, was a parking lot riddled with fissures and cracks.

Having identified the problem—and being unsatisfied with Rockford's superficial repairs—Tanger hired a different firm to repair the parking lot. Nearly $3 million later, Tanger's parking lot is finally smoothed over.

The same can't be said for its relationship with the project team. Eager to hold someone accountable for the parking lot debacle, Tanger sued everyone involved, including Rockford.

Rockford, in Tanger's view, breached their contract in several ways. After years of dueling motions and failed mediation, Tanger and Rockford both moved for summary judgment. On the breach-of-contract claim—the only one relevant here—the district court denied Tanger's motion and granted Rockford's. Tanger now appeals.

II.

Tanger argues Rockford breached four provisions of their contract. We consider Tanger's claims in turn and review the district court's conclusions de novo. *See Hudson v. City of Highland Park*, 943 F.3d 792, 800 (6th Cir. 2019).

A.

Begin with Sections 3.1.2 and 3.5.1 of the contract's General Conditions. Those Sections required Rockford's work to conform to the "Contract Documents." Tanger makes two arguments that Rockford breached this requirement, but neither succeeds.

1.

Tanger first asserts Rockford breached the contract "by providing improper materials in accordance with Section 3.1.2." Appellant Br. 7. But Section 3.1.2 imposed no such obligation on its own. It required only that the "Work" conform to the "Contract Documents." R. 458-1, Pg. ID 3299. So Tanger looks elsewhere. "Work," as used in Section 3.1.2, is defined in Section 1.1.3. It is "the construction and services required by the Contract Documents" and "includes all other . . . materials . . . provided . . . by the Contractor to fulfill the Contractor's obligations." *Id.*, Pg. ID 3296. Tanger argues Rockford's liability can be found somewhere in that definition.

It can't. Section 1.1.3 imposed no obligation for Rockford to provide the project's materials. It required only that Rockford perform the entire project—including any materials requirements—in accordance with the Contract Documents. And because Rockford did not

provide the on-site materials, their use did not violate Section 3.1.2. To be sure, Section 1.1.3 also stated that *if* Rockford needed to provide "other" materials to "fulfill [its] obligations," *then* those materials would've been part of the "Work" Rockford performed under Section 3.1.2. *See id.* But Rockford didn't need to procure any materials for the parking lot besides those already on-site. Thus, Rockford isn't liable under Section 1.1.3.

2.

Tanger's second argument points to a separate document prepared by Nederveld (the "Nederveld Specifications"). Tanger argues the Nederveld Specifications required Rockford to hire an independent materials-testing firm. Had Rockford hired an independent testing firm, Tanger argues, that firm would have identified the on-site material's inadequacy. Thus, the question is whether the contract obligated Rockford to follow the Nederveld Specifications.

Whether a document is part of a contract is a factual question. *See Bullock v. Auto. Club of Mich.*, 444 N.W.2d 114, 129–30 (Mich. 1989) (opinion of Levin, J.); *Gosnick v. Wolff*, 115 N.W.2d 396, 399 (Mich. 1962); *Detroit Pub. Schs. Program Mgmt. Team v. Valley Forge Ins. Co.*, 483 F. App'x 150, 152 (6th Cir. 2012). And here, the parties dispute whether the Nederveld Specifications are part of their contract. So one might think summary judgment isn't appropriate. But a mere dispute isn't enough. To defeat summary judgment, the dispute must be *genuine*; there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). By that measure, Rockford has met its burden, and Tanger hasn't. No reasonable jury could conclude the Nederveld Specifications are part of the contract.

Start with the contract itself. According to its definition of "Specifications" in Section 1.1.6 of the General Conditions, all operative specifications must come from "the Contract

Documents." Those "Contract Documents," as the contract's integration clause explains, are "the entire and integrated agreement" between Tanger and Rockford, "supersed[ing] prior negotiations, representations or agreements." R. 457-1, Pg. ID 3262. The list of Contract Documents appears in Article 16's "Enumeration of Contract Documents." *Id.* One of the Contract Documents is called "The Specifications." *Id.*, Pg. ID 3277. Under "The Specifications," the contract instructs the drafter to either "list the Specifications" themselves or "refer to an exhibit attached" to the contract. *Id.* Tanger chose the latter, directing Rockford to "See Exhibit B" to find the binding specifications. *Id.* Exhibit B, in turn, is called "List of Specifications." *Id.* That list enumerates several individual specifications. Each specification has a six-digit identifier; the first two digits identify the category, or "division," and the last four identify the specific requirement. Take, for example, specification 12-3600. The 12 means it's in Division 12—the "Furnishings" Division— and 3600 is the unique identifier for "Countertops." R. 459-1, Pg. ID 3340. Exhibit B contains dozens of these six-digit specifications. By signing the contract—integration clause and all— Tanger affirmed that the only binding specifications were those listed in Exhibit B. So any requirement that Rockford hire an independent testing firm must come from a specification listed in Exhibit B.

Tanger can't identify any specification in Exhibit B containing the independent-testing requirement. The only place it can find that requirement is the Nederveld Specifications, which use the same six-digit numbering system as Exhibit B. One of the Nederveld Specifications' requirements is numbered 31-2000: "31" for the "Earthwork" Division, and 2000 for "Earth Moving." Specification 31-2000 requires the "[c]onstruction manager"—Rockford—to hire an

independent materials testing firm.[3] R. 492-4, Pg. ID 5434. But specification 31-2000 does not appear in Exhibit B. Exhibit B only has one specification in its Earthwork Division, and its identifier is 31-2316, not 31-2000. As in the Nederveld Specifications, the 31 corresponds to the "Earthwork" Division. R. 459-1, Pg. ID 3340. "2316," however, corresponds to "Excavation," not "Earth Moving." *Id.* And nothing in specification 31-2316 obligates Rockford to hire an independent testing firm. Thus, the obligation Tanger seeks to enforce against Rockford appears only in the Nederveld Specifications and not in Exhibit B.

But Tanger has a response. At oral argument, Tanger's counsel suggested that Exhibit B's list is non-exhaustive. For evidence, he relied on a statement in Article 1 of the contract that the Contract Documents include, in broad terms, "Specifications." Thus, the argument goes, because the Nederveld Specifications are, strictly speaking, "Specifications," they must be part of the contract; Exhibit B's list is simply a set of *additional* specifications. We disagree. In Section 16.1.4 of the contract, the parties defined "The Specifications" to which Article 1 refers. That Section immediately makes clear that the only operative Specifications are those appearing in Exhibit B. The contract, moreover, gave Tanger the option to list "additional documents" it wanted to include in the contract. R. 457-1, Pg. ID 3277. Tanger could have easily included the Nederveld Specifications as an Exhibit, or even added specification 31-2000 to the list in Exhibit B. But it didn't. So its attempt to insert ambiguity into Article 1 is unavailing. *See Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 460 (Mich. 2003). Because the independent-testing requirement does not appear in Exhibit B, Rockford did not have to follow it.

---

[3] The Nederveld Specifications' Table of Contents enumerates this specification as 312200. But in the body of the document, it's enumerated as 312000. Because the document contains no other specification enumerated 312200, we assume that 312000 is the correct number.

That's enough to defeat Tanger's claim. Where, as here, a contract is completely integrated, courts won't consider outside evidence of collateral agreements or additional requirements. *See UAW-GM Hum. Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 418 (Mich. Ct. App. 1998). That's for good reason; one of the central purposes of contracts is to efficiently allocate risk in advance of performance. *See, e.g.*, *Galvan v. Poon*, 999 N.W.2d 351, 358 (Mich. 2023). So courts won't consider a disappointed party's late-breaking evidence of other "agreements" in an effort to shift its losses after the fact. Otherwise they'd both undermine the parties' expressed will and unravel the careful risk balancing that contracts entail. *See Concast, Inc. v. AMCA Sys., Inc.*, 959 F.2d 631, 632 (7th Cir. 1992) (Easterbrook, J.). We decline Tanger's invitation to do so here.

But if that weren't enough, contrast the Nederveld Specifications with Exhibit B's specification 31-2316. The Nederveld Specifications use a different font and format than specification 31-2316, whose font and format mirror the standardized Tanger-Rockford contract. *Cf. Detroit Pub. Schs.*, 483 F. App'x at 152. The Nederveld Specifications display a conspicuously unfilled "<DATE>" field, while specification 31-2316 includes an effective date. The Nederveld Specifications don't have headers; specification 31-2316's header is nearly identical to Exhibit B's. That fact suggests that someone other than Nederveld drafted specification 31-2316, which in turn suggests that Nederveld *didn't* draft the binding set of specifications. Thus, even without the contract's integration clause, it's difficult to "harmonize" the Nederveld Specifications with the Tanger-Rockford contract. *Thiel v. Goyings*, 939 N.W.2d 152, 160 (Mich. 2019).

In response, Tanger points to testimony from the project's key players. First is Z. Paul Cirjak, Tanger's director of construction. Cirjak filed an affidavit explaining that he never "limited or eliminated" Rockford's purported obligation to engage an independent testing agency. R. 492-

1, Pg. ID 5309. Tanger also cites testimony from Barr, Nederveld's lead engineer, stating that he believed the Nederveld Specifications were a "governing document" for the project. R. 463-1, Pg. ID 3498. In Tanger's view, this testimony shows the Nederveld Specifications were always part of the contract.

That testimony, however, is exactly the type of collateral evidence Michigan courts won't consider when a contract is validly integrated. *See UAW-GM*, 579 N.W.2d at 418. And because that's the case here, neither will we.

In short, no reasonable jury could conclude that the Nederveld Specifications were part of the contract. And because nothing else in Sections 3.1.2 or 3.5.1 imposed unmet obligations on Rockford, Tanger's arguments fail.

B.

Tanger's third claim also falls under Section 3.5.1. Elsewhere in that Section, Rockford warranted that the "Work" would be "free from defects, except for those inherent in the quality of the Work the Contract Documents require or permit." R. 458-1, Pg. ID 3301. The Contract Documents at least permitted Rockford to use on-site material.[4] So the question here is whether the on-site material's excessive fines content was an "inherent" defect.

Michigan courts interpret unambiguous contractual terms according to their ordinary meaning. *See In re Smith Tr.*, 745 N.W.2d 754, 757–58 (Mich. 2008). In doing so, they refer to dictionaries, which define "inherent" as "involved in the constitution or essential character of something." *Inherent*, Webster's Third New International Dictionary (1961); *see also Inherent*, World Book Dictionary (1985) ("belonging to a . . . thing as a quality or attribute; essential");

---

[4] At oral argument, Tanger's counsel clarified that Tanger directed Rockford to use the on-site materials. Oral Argument at 02:01–02:13 (Q: "As I understand it, Tanger is the one who . . . directed that the on-site materials be used, correct?" A: "The court is absolutely correct . . . the answer is yes.")

*Inherent defect*, Black's Law Dictionary (11th ed. 2019) (synonymous with hidden defect, meaning an imperfection "that is not discoverable by reasonable inspection"); *Vushaj v. Farm Bureau Gen. Ins. Co.*, 773 N.W.2d 758, 759–60 (Mich. Ct. App. 2009) (per curiam). Thus, if the parking lot's defects were caused by the material's essential qualities—and not by anything Rockford did—Rockford isn't liable.

Applying the term's ordinary meaning, the on-site material's fines content was "inherent." Fines content is an intrinsic feature of soil unaffected by builders who use it, and Tanger points to no evidence suggesting otherwise. Nor does it seem likely it could. If the fines content is not an "inherent" quality of the material, then what kind of quality is it? Rockford, after all, didn't do anything to increase the fines content. It simply used the soil MTC said satisfied the specifications.

For its part, Tanger asserts that the parking lot was delivered with "defects." But it never seriously responds to Rockford's argument that those defects were "inherent" in the materials Tanger directed it to use. Instead, it makes three separate arguments. None succeeds.

First, Tanger concedes that it required Rockford to use on-site materials. But, it argues, that use "was conditioned upon such materials being suitable." Reply Br. 4. Tanger, however, identifies no contractual provision imposing such a condition.[5] And even if it could, nothing obligated *Rockford* to make the suitability determination. In fact, representatives from Tanger and Nederveld explained that responsibility for adequate material testing laid with MTC. What's more, Tanger's own head of construction expected Rockford—and the rest of the project team—to rely on MTC's determination that the materials were suitable. Tanger's attempt to impose an unwritten condition on Rockford is unavailing.

---

[5] In another portion of Section 3.5.1, Rockford warranted that "materials . . . furnished under the Contract will be of good quality . . . unless the Contract Documents require or permit otherwise." R. 458-1, Pg. ID 3301. Tanger, however, does not rely on that provision of the warranty in its arguments. And, again, Rockford did not furnish the on-site materials.

Second, Tanger points to expert testimony suggesting all the on-site subbase soils—including SP and SP-SM—were "inadequate" and that Rockford should've "removed and replaced" them. R. 492-13, Pg. ID 5605. But Tanger instructed Rockford to use on-site SP and SP-SM. And Nederveld and MTC approved the existing materials as meeting the specifications. The expert also suggests that the on-site subbase materials contained soils besides SP and SP-SM that Rockford should've identified and removed. But Tanger has pointed to no evidence on appeal suggesting Rockford could've identified those specific soils without more testing. In fact, testimony from MTC's representative suggests the opposite. *See* R. 466-1, Pg. ID 3643 ("Q. Is it possible to classify an MDOT Class II soil without conducting a sieve analysis?" A. "No."). And any additional-testing obligation on Rockford is hard to square with MTC's sole responsibility for testing.

Finally, Tanger points to construction debris found in the subbase material, apparently left there by Rockford during construction. Tanger then claims that the debris shows Rockford's "improper execution of the Work" in a manner not "inherent" in the contract. Whatever its merits, we decline to consider this eleventh-hour argument, "both because it is undeveloped and because it was first raised in a reply brief." *United States v. Presley*, 18 F.4th 899, 902 n.2 (6th Cir. 2021) (citation omitted).

Because the problems with the on-site materials that Tanger directed Rockford to use were inherent, Rockford isn't liable under Section 3.5.1 for the damage they caused.

C.

Finally, Tanger argues Rockford breached Section 12.2.2.1 of the General Conditions. That Section obligated Rockford to repair, at its "sole expense" and upon "written notice" from Tanger, any "Work . . . found to be not in accordance with the requirements of the Contract

Documents." R. 458-1, Pg. ID 3324. So for Rockford to be liable, Tanger must show more than notice and subsequent failure to repair. Like most of Tanger's claims, the question is whether Rockford's work conformed to the Contract Documents.

It did. As detailed above, Rockford used the materials Tanger directed it to. And Tanger makes no cognizable argument that Rockford otherwise failed to meet the contract's requirements. Instead, Tanger offers a litany of undisputed facts allegedly showing Rockford breached the contract. But there's a weak link in Tanger's logical chain: Tanger fails to show how Rockford's performance was "not in accordance with the requirements of the Contract Documents." Appellant Br. 23. Tanger only alleges breaches related to the materials Rockford used. But, at the risk of repetition, Rockford used the materials Tanger required and Nederveld and MTC approved. That's not a breach. And without any breach, Rockford owed no duty to repair. So Tanger's Section 12.2.2.1 claim fails.

But wait, Tanger says. Rockford already agreed by letter to "help[] correct the work . . . as required by the terms of the Contract" and proposed to "perform correct work." R. 492-15, Pg. ID 5630. That commitment, Tanger argues, is just as binding as the rest of the contract.

Not so. No matter what Rockford committed to do, any such commitment was gratuitous and thus nonbinding. Rockford's obligation to repair the parking lot was conditional; it could only spring into being "if" Rockford's work didn't comply with the Contract Documents. R. 458-1, Pg. ID 3324; *see Harbor Park Market, Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007). As explained above, Rockford's work complied with the Contract Documents. So its obligation to repair the parking lot remained dormant. Nor did Tanger provide additional consideration for Rockford's agreement to repair the parking lot. *See* 3 Williston on Contracts § 7:8 (4th ed.); *Sanchez v. Eagle Alloy Inc.* 658 N.W.2d 510, 516–17 (Mich. Ct. App. 2003). Rockford's

apparently mistaken belief that the contract required it to fix the parking lot doesn't change the fact that it was under no enforceable obligation to do so.  Thus, Tanger finds no recourse in Section 12.2.2.1.

*          *          *

Several mistakes were made on Tanger's parking lot project.  But under the terms of the contract, Rockford didn't make them.

We affirm.